IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 3, 2020

IN RE KATRINA S.

Appeal from the Circuit Court for Hamblen County
No. 18AD009    Alex E. Pearson, Judge

No. E2019-02015-COA-R3-PT

Trista S. ("Mother") appeals the termination of her parental rights on the grounds of (1) persistence of conditions; (2) failure to manifest a willingness and ability to assume custody of the child; and (3) mental incompetence. Mother also appeals the trial court's finding that termination of her parental rights is in the best interests of the child. Because the record contains clear and convincing evidence supporting the grounds for termination and the best interests determination, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Betsy Hardin Stibler, Morristown, Tennessee, for the Appellant, Trista S.

Aaron J. Chapman, Morristown, Tennessee, for the Appellees, Clarence C. and Deborah C.

## OPINION

## BACKGROUND

This appeal arises from the termination of a mother and father's parental rights as to their daughter, Katrina S. (the "Child").[1]  The Child was born to Mother and James S. ("Father") on May 3, 2013.  Shortly after the Child's birth, Mother and Father separated, although the record does not reveal when Mother and Father actually divorced.  Born several weeks premature, the Child has been diagnosed with a failure to thrive, global delays, gastrointestinal issues, and a feeding disorder that renders it extremely difficult for

---

[1] In cases involving minor children, it is this Court's policy to redact names in order to protect the children's identity.

1

the Child to eat and gain and/or maintain sufficient weight. Additionally, it is undisputed that both Mother and Father have intellectual disabilities.[2]

The Child was in the primary care of Mother after the parents separated, and Father exercised some weekend visitation with the Child. From the time of her birth, the Child was unable to gain an appropriate amount of weight. By the time the Child was three years old, she weighed only twenty-three pounds and was not showing progress in her weight gain. At some point prior to removal of the Child from Mother's home, Mother had a feeding tube placed in the Child's abdomen.

On April 26, 2017, Father filed a petition in the Juvenile Court for Knox County, Tennessee ("Juvenile Court") asking to be awarded legal and physical custody of the Child. Father alleged that Mother was not appropriately feeding the Child and that the Child was still unable to gain weight while in Mother's care. Father further alleged that while the Child was still using the feeding tube, the Child's doctors wanted to transition the Child to oral feeding. Father asserted that Mother was resistant to and uncooperative with the Child's doctors and that Mother inexplicably wanted the Child to remain on a feeding tube. Father also asserted that on the weekends when he had visitation with the Child, she was able to eat orally and would eat a variety of foods and gain weight, but the Child's weight would then decrease when returned to Mother's care. Father also averred that Mother was keeping the feeding tube installed so that Mother could receive Social Security benefits on behalf of the Child. Father asked the Juvenile Court to determine that the Child was dependent and neglected in Mother's care.

On June 8, 2017, DCS filed a motion to intervene in the Juvenile Court action. DCS asked the Juvenile Court to adjudicate the child dependent and neglected and to restrain Mother from consenting to any additional medical care as to the Child. DCS's intervening petition further alleged that Mother had exhibited a pattern of noncompliance with the Child's medical care providers, of relaying inaccurate information from one provider to another, and of requesting unnecessary treatments for the Child, including the Child's feeding tube. Specifically, DCS alleged the Mother had falsely stated that a nurse practitioner had referred the Child for insertion of the feeding tube and that Mother had not been compliant with the feeding instructions once the tube was inserted. The primary concern raised by both Father and DCS was that the Child simply was not being fed enough in Mother's home and that Mother was either unwilling or unable to cooperate with the Child's care providers.

The Juvenile Court entered an Interim Order on January 19, 2018 *nunc pro tunc* to June 19, 2017, granting DCS's request to intervene and restraining Mother from making

---

[2] Father stipulated at trial that due to his intellectual disabilities and the Child's advanced medical needs, Father is not equipped to assume custody of the Child. Father agreed to the termination of his rights and adoption of the Child and is not participating in the present appeal.

2

any additional medical decisions for the Child. The Child, however, remained in Mother's primary custody with continued weekend visitation with Father. A final hearing was set for October 2, 2017. However, on September 1, 2017, DCS filed a petition for temporary legal custody of the Child, alleging largely the same issues raised in its first petition and asking the Juvenile Court to place the Child in DCS custody. The basis of this emergency petition was Mother's decision to schedule an oral surgery for the Child without consulting DCS. Additionally, Mother continued to resist the help of the Child's medical team by failing to log the Child's food intake, failing to take the Child to scheduled therapy appointments, and allowing the Child to "graze" rather than designating meal times for the Child. Further, the petition averred that Mother reported giving the Child a particular medication when the prescription had not been picked up in several months. There was also an allegation in the petition that Mother and Father were unable to cooperate with one another as to the Child's feeding routines. In sum, DCS sought custody of the Child due to the parents' "failure to comply with instructions for the care and feeding of [the Child]." DCS's petition was granted on September 28, 2017.

Thereafter, the Child was placed in two different foster homes before being placed with Deborah C. and Clarence C. ("Petitioners"). Mrs. C. was an acquaintance of Father, and Father requested that Mrs. C. be granted temporary custody of the Child. Mrs. C. intervened in the DCS action, and the Child was placed in Mrs. C.'s home in January of 2018, where the Child remained on the date of trial. In the meantime, DCS created a family permanency plan for Mother, which was approved by the Juvenile Court on December 3, 2017. The original goal of the plan was to return the Child to Mother, and Mother was required to initiate supervised visitation with the Child through the Child's case manager. Mother was also required to bring healthy, age-appropriate snacks to the visits. Mother's action steps under the plan required Mother to: (1) demonstrate skills learned during visits with the Child by reducing the number of prompts given by the provider; (2) follow feeding therapy requirements by having the Child sit in her high-chair for a set period of time when the Child was given food; (3) demonstrate knowledge and ability to care for the Child during visitation without prompts from the provider; (4) maintain a journal of the Child's medical needs and appointments to ensure accuracy; (5) play with the Child during visits rather than sitting on the couch; and (6) cooperate with service providers including following all instructions. The plan also required Mother to see a therapist and undergo a psychological evaluation to address Mother's responsibility for the Child's medical issues and the Child having received potentially unnecessary medical treatments. Another permanency plan was ratified on April 12, 2018, with largely the same action steps and requirements for Mother. The record shows that Mother had difficulty adhering to the plan, particularly in regards to learning how to appropriately feed the Child.

On May 22, 2018, the Juvenile Court held a final hearing on DCS's petition and concluded, by agreement of the parties, that the Child was dependent and neglected. Both Mother and Father were present at the hearing and stipulated that the Child was dependent and neglected. They agreed that due to their diminished intellectual capacity, they were

unable to adequately meet the special needs of the Child. In particular, Mother agreed that her cognitive disabilities impaired her capacity to convey accurate, reliable information to the Child's healthcare providers and her ability to properly follow medical directives. An agreed order reflecting the foregoing was entered May 24, 2018.

The Petitioners filed a Petition for Termination of Parental Rights and Adoption (the "Petition") on October 3, 2018 in the Circuit Court for Hamblen County, Tennessee (the "Trial Court").[3] The alleged grounds for termination were abandonment by failure to support, abandonment by failure to visit, substantial noncompliance with the permanency plan, persistence of conditions, impaired mental condition, and a failure to manifest a willingness and ability to assume custody of the Child or financial responsibility for the Child. Mother answered the Petition on March 12, 2019, denying all alleged bases for termination and denying that termination of Mother's parental rights would be in the Child's best interests. The parties entered into an Agreed Order on March 22, 2019, providing that Mother would have supervised visitation with the Child during the pendency of the termination proceeding and that such visitation would take place every other Tuesday for two hours at a mall in Morristown, Tennessee.

The trial took place on September 10, 2019. Witnesses at trial included Father, Mother, and Mrs. C. Father testified that the Child was well-cared for by Petitioners and that Father did not feel he was capable of accommodating the Child's advanced medical issues. Father testified that although he was not involved when the feeding tube was initially placed in the Child, he had substantial doubt that the feeding tube was necessary because the Child would eat orally when she was with Father. Father expressed that the Child was losing so much weight while in Mother's custody that he feared the Child would die if he did not get DCS involved. Although he offered no proof, Father articulated his belief that Mother was withholding food from the Child and keeping the Child on the feeding tube in order to draw additional Social Security benefits. Overall, Father expressed a substantial fear for the Child's health and safety should she return to Mother's custody. He testified that it would be in the Child's best interests for the Child to remain with Petitioners.

Mother's testimony was quite different from Father's. Mother testified that she does not work and that because she is unable to manage her own finances, her sister pays her bills for her and has a conservatorship over her. While Mother admitted stipulating in the Juvenile Court that the Child was dependent and neglected, Mother maintained at trial that she was capable of caring for the Child and that the Child did not actually have trouble eating while in Mother's care. In fact, Mother testified that the Child's primary issue was that the Child was shy and preferred not to eat in the presence of anyone other than Mother and Mother's family. To the extent Mother acknowledged the Child's inability to eat and gain weight, Mother's position was that the Child's medical issues arose due to the failure

---

[3] The Petitioners and the Child reside in Hamblen County.

4

of doctors and nurses to listen to Mother. Perhaps most importantly, Mother's testimony at trial reflected an inability to answer questions regarding the Child's medical history and needs and a tendency to blame others involved in this case for the Child's removal from Mother's home.

The Trial Court also heard testimony from Mrs. C., who testified that the Child had gained weight since her placement with the Petitioners and no longer needed her feeding tube. Mrs. C. also testified that when the Child first arrived in their home, she was essentially non-verbal and was still using diapers. According to Mrs. C., the Child had vastly improved since that time, and could recognize colors, sound out words, and write her name. Overall, Mrs. C. expressed that the Child had become integrated into the Petitioners' home. Mrs. C. acknowledged that the Child is still underweight for her age and that her feeding schedule and diet requires ongoing maintenance and attention. Specifically, Mrs. C. testified that the Child has designated times at which she eats and that Mrs. C. closely supervises the Child to ensure that the Child eats foods such as meat and vegetables.

At the close of proof, the Trial Court found that Petitioners failed to carry their burden as to several of the alleged grounds for termination. The Trial Court ultimately determined, however, that Petitioners proved by clear and convincing evidence the grounds of persistence of conditions, failure to manifest a willingness and ability to assume custody of the Child, and mental incompetence. The Trial Court also found that termination was in the Child's best interests and made an express finding that Mother's testimony was not credible. A memorandum opinion was entered by the Trial Court on October 9, 2019, followed by the final order terminating Mother's parental rights on November 1, 2019.[4] Mother filed a timely notice of appeal to this Court on November 13, 2019.

## ISSUES PRESENTED

Mother raises four issues on appeal, which we restate as follows:

1.      Whether the Trial Court erred in concluding that clear and convincing evidence supports termination of Mother's parental rights on the basis of persistence of conditions.

2.      Whether the Trial Court erred in concluding that clear and convincing evidence supports termination of Mother's parental rights on the basis that Mother failed to manifest a willingness and ability to personally assume legal and physical custody of the Child.

---

[4] The initial final order in this case did not contain any findings as to Father. The Trial Court later entered an amended memorandum opinion and amended final order reflecting that Father's parental rights were also terminated. The amended memorandum opinion and final order contain no changes as to the findings and conclusions regarding Mother.

3.      Whether the Trial Court erred in concluding that clear and convincing evidence supports termination of Mother's parental rights on the basis that Mother's mental condition is presently so impaired and is so likely to remain so that it is unlikely she will be able to assume care and responsibility of the Child in the near future.

4.      Whether the Trial Court erred in concluding that clear and convincing evidence proves that termination of Mother's parental rights is in the best interests of the Child.

The Petitioners raise no additional issues for review in their posture as Appellees.

## STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-

convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

Finally, this Court affords considerable deference to a trial court's findings where issues of credibility and weight of oral testimony are involved, as the trial court had the opportunity to see and hear the witnesses. *State Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006). Where an issue "hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Id.* (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990)); *see also Franklin Cty. Bd. of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) ("If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002))).

**DISCUSSION**

In the present case, the Trial Court found clear and convincing evidence to support termination of Mother's parental rights based upon three grounds. We therefore address each of these grounds in turn.

## I. Grounds for Termination

### A. Persistence of Conditions

The Trial Court concluded that Petitioners proved by clear and convincing evidence that Mother's parental rights should be terminated based upon persistence of the conditions underlying the Child's initial removal from Mother's custody. Tennessee Code Annotated section 36-1-113(g)(3)(A) explains that a person's parental rights can be terminated when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

The purpose of the persistence of conditions ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016). Consequently, "[t]he failure to remedy the conditions which led to the removal need not be willful." *Id.* (citing *In re T.S. and M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000)). Even if not willful, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the

parent's care." *Id.* (citing *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

In this case, there is no dispute that the Child was removed from Mother's home for more than six months before Petitioners initiated the termination process. The Child was initially removed from Mother's care based upon concerns that Mother was unable to fully comprehend the Child's specialized medical needs and was communicating inaccurate information to the Child's doctors resulting in inappropriate and/or unnecessary medical procedures for the Child, including the Child's feeding tube. Mother also had difficulty cooperating with the Child's care providers, particularly in following their directions as to the Child's diet and feeding the Child an appropriate amount of food. Additionally, there was concern that Mother was not always honest regarding the Child's symptoms and the care the Child was receiving. For example, on at least one occasion Mother informed DCS that the Child was taking a certain medication, but Mother had not picked up the prescription in several months. Consequently, the Child's removal from Mother's custody was precipitated by Mother's failure to sufficiently accommodate the Child's particular needs.

The Trial Court made the following findings regarding persistence of conditions:

The Court has great concern that if the minor child was allowed to be returned to the mother then the child would suffer greatly in the mother's case [sic]. The minor child has issues eating and continues to have those issues to this day. During the time the child was in the custody of the mother, the child had two feeding tubes installed due to the child's significant weight loss and failure to thrive. . . . The mother's unwillingness or inability to truthfully answer basic questions consistently coupled with her attitude that everyone else is being untruthful but her causes this Court great concern in her ability to properly care for a child that needs special attention to ensure a proper level of quality food is being consumed by the child. [Mother's] level of ability to manage her own affairs has led to her sister being appointed as her financial conservator and that coupled with her past inability to comply with the necessary medical directives leads this Court to the unfortunate but necessary conclusion that if returned to the mother the child would suffer further neglect and that there is little to no likelihood that these conditions will be remedied at an early date so that the child can be returned home in the near future.

Importantly, the Trial Court also noted the following with regard to Mother's credibility:

The Court noticed the demeanor of [Mother] closely and noted the fact she would never answer a question without looking toward her attorney in hopes of guidance on how to answer the question. . . .The Court further noted on

more than one occasion [Mother] would change her answer depending on who asked the question and appeared often to answer a given question differently depending on if she thought the person asking the question was on her side or not. [Mother] at one point in her direct examination admitted to willfully testifying falsely then attempted to explain her answer away while being question[ed] by her attorney. [Mother] denied ever providing false or incorrect information to any doctors. When confronted with the Juvenile Court findings that she had, [Mother's] explanation was that everyone else was wrong or not truthful but her. [Mother] tried to blame [Petitioners] for the limited visitations that had occurred pursuant to the Juvenile Court Order. [Mother] testified about how involved with her daughter she was during the visits; however, [Petitioners] introduced video and photographic evidence that established that often during the limited visits [Mother] had with her daughter she would be using her telephone instead of being actively engaged with the child. [Mrs. C.] testified that this was typical of the visits that [Mother] would be on her phone consistently throughout the visits and not engaged in spending time with her daughter. The Court simply does not accredit the testimony of [Mother].

The evidence in the record preponderates in favor of the Trial Court's findings. The record shows that Mother is simply not equipped to deal with the Child's health needs, as Mother has both difficulty understanding those needs and taking directions from medical professionals. On multiple occasions during her testimony, Mother was unable to answer basic questions regarding the Child's medical needs and history. For instance, when first asked about the incident in which DCS confronted Mother regarding whether the Child was being given her Omeprazole, Mother testified that she remembered admitting that the Child was not being given the medication. Later in her testimony, however, Mother maintained that she had been appropriately giving the Child her medication. Mother also testified that she took the Child to have the feeding tube installed but later testified that the Child never had problems eating while in Mother's home. Specifically, Mother testified that the Child "has always eaten with [Mother]," and that Mother has "not had to do no prompts to get [the Child] to eat." However, Mother then testified that the Child has "a hard time eating and chewing[,]" and that the Child would vomit "every time" Mother tried to feed the Child orally. Further, Mother testified that the Child's problem is not medical, but rather that the Child is shy and does not like to eat in front of anyone aside from Mother's family. Mother's characterizations of the Child's eating issues are troubling because they are both inconsistent and dismissive. Mother's characterizations are even more confounding in light of the fact that Mother is the person who initially sought placement of the Child's feeding tube.

Mother also testified that she requires the assistance of her own mother at the Child's medical appointments because Mother generally has difficulty understanding doctors' instructions, but she also testified that she is wholly capable of taking care of the Child. At

multiple points during her testimony, Mother blamed the shambolic state of the Child's health on other people, including Father and the Child's nurse practitioner. Specifically, Mother testified that she did not have any responsibility for the Child's inability to gain weight while the Child was in her custody and that the fault lay with the Child's doctors and nurses for failing to listen to Mother. Mother also testified that the doctors "always listened to [Father]" rather than Mother; however, Father testified that he was not notified about the placement of the Child's feeding tube until after the fact.

Overall, Mother's testimony reflects a general lack of understanding of the Child's medical history and needs and, perhaps most importantly, an unwillingness to accept any responsibility for errors in the Child's medical care. Clear and convincing evidence therefore supports the Trial Court's finding that the conditions necessitating the Child's removal persisted at the time of trial, as the primary condition underlying the Child's removal was Mother's inability to acknowledge and address the Child's particular health issues. Moreover, Mother's testimony inspires little confidence that her situation will improve at any point, much less in the near future; indeed, Mother appears to resist the notion that her parenting need change at all.

Mother argues on appeal that the condition necessitating the Child's removal was the Child's difficulty eating and gaining weight and that because those conditions are still ongoing with the Child, there is no evidence that problems with Mother's parenting persist. Mother's argument is unavailing. The condition precipitating the Child's removal from Mother's home was not the Child's physical condition in and of itself, but rather Mother's behavior, which the Trial Court found was not corrected or addressed by the time of trial. This point is buttressed by the Trial Court's credibility findings as to Mother, as a significant portion of Mother's parenting issues arise from her inability to accurately and honestly communicate medical information about the Child. The Trial Court concluded that this problem persisted by the date of trial, expressly finding Mother's testimony not credible. Because the Trial Court's decision here hinges on the credibility of Mother, "the [T]rial [C]ourt will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the [T]rial [C]ourt's findings." *State Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006). Our review of the record does not reveal any such evidence, nor has Mother pointed us to any. As such, this Court is not at liberty to disturb the Trial Court's findings. *See In re Navada N.*, 498 S.W.3d at 591 ("When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995))).

Whether Mother's inability to adequately navigate the Child's needs stems from an unwillingness to do so or Mother's cognitive deficiencies, the fact remains that Mother is unable to provide fundamental care to this particular Child. *See In re Navada N.*, 498

S.W.3d at 605 ("A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care."). Mother's refusal to acknowledge any deficiencies in her parenting inspires little confidence that this condition will be remedied in the near future, or that safe reintegration of the Child into Mother's home is possible. Consequently, we agree that clear and convincing evidence supports the termination of Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3)(A).

## B. Failure to Manifest a Willingness and Ability to Assume Custody

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. Tenn. Code Ann. § 36-1-113(g)(14). The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

At the outset, we note that this ground was not added to the termination statute until 2016, and "because of [its] relatively recent enactment . . . few cases have considered this particular ground." *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9 (citing *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *17 (Tenn. Ct. App. May 8, 2018)). However, "a split of authority exists as to how the first element must be proven." *Id.* One panel of this Court has concluded that the first prong of the statute requires the petitioner to prove *both* an inability and an unwillingness of the parent to assume custody or financial responsibility for the child. *See In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (emphasis added). A separate panel of this Court later concluded that section (g)(14) allows for termination of parental rights where a parent has manifested a willingness but not the ability to assume custody or responsibility for the child. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018). The *Amynn K.* court reached this conclusion by "[a]nalyzing each phrase of the statute, [explaining] that 'the petitioner must prove the legal parent or guardian's failure to do something' -- specifically, the parent's failure 'to satisfy a conjunctive basic requirement.'"

*In re Colton B.*, 2018 WL 5415921, at *9 (citing *In re Amynn K.*, 2018 WL 3058280, at *13). As such, in the view of the *Amynn K.* court, the "basic requirement" of section 36-1-113(g)(14) is that the parent must manifest both an ability <u>and</u> willingness to assume custody of a child. *Id.* (emphasis added).

Since the *Amynn K.* decision, various panels of this Court have opted to follow either *Ayden S.* or *Amynn K.* *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *11–14 (Tenn. Ct. App. July 22, 2020) (containing a thorough analysis of both approaches). However, this Court has also held that when a parent fails to manifest neither a willingness nor an ability to assume custody, it is unnecessary to "adopt one approach over the other." *See, e.g.*, *In re Colton B.*, 2018 WL 5415921, at *10 (concluding that the parent at issue manifested neither the ability nor the willingness to assume custody or financial responsibility of the child); *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (same).

Likewise, here it is unnecessary to address the split of authority created by *Ayden S.* and *Amynn K.* because even the more stringent standard is satisfied. The Trial Court concluded that Mother failed to manifest a willingness and an ability to assume legal and physical custody of the Child,[5] primarily due to Mother's refusal to take responsibility for the Child's poor physical condition while in Mother's care:

> The Court is deeply concerned with [Mother's] consistent dishonesty or inability to tell the truth coupled with her unwillingness or inability to accept personal responsibility for her failures in caring for [the Child]. [Mother] has taken no steps or actions to improve her ability to care for [the Child] other than the failed efforts prior to removal. In fact, [Mother] takes the position that everyone is wrong but her and that she did everything right. This attitude demonstrates to the Court an inability or unwillingness to personally assume physical custody of [the Child] and certainly causes this Court serious concern that placing [the Child] in [Mother's] home would pose a real and substantial risk of harm to the minor child. The Court has no doubt that the issues identified and found by clear and convincing evidence in the Juvenile Court still persist, and this Court finds by clear and convincing evidence that [Mother's] ability to accurately relay information of any type not just medical information is a serious problem based on the testimony and proof at trial.

We agree with the Trial Court that Mother has failed to manifest an ability to assume custody of the Child due to her failure to appropriately address the medical needs of the Child. Mother stipulated that her intellectual disabilities render it difficult for her to provide appropriate care to the Child, and the record shows that the Child was unable to

---

[5] The Trial Court based its decision on Mother's willingness and ability to assume custody, rather than Mother's ability and willingness to assume financial responsibility.

maintain a sufficient weight when in Mother's custody. By the time of trial, Mother was still unable to comprehend the issues surrounding the Child's removal, as Mother adamantly testified that she never had problems getting the Child to eat. Mother was also unable at trial to answer questions regarding the Child's health honestly and accurately. *See In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) ("Ability focuses on the parent's lifestyle and circumstances." (citing *In re Maya R.*, 2018 WL 1629930, at *7)). Consequently, clear and convincing evidence shows that Mother's circumstances are such that she is simply not able to assume care and custody of this Child.

Likewise, Mother failed to manifest a willingness to assume custody by failing to take any steps necessary to resolve these issues, thereby demonstrating a general lack of interest in actually obtaining custody of the Child. *See In re Jaxx M.*, 2019 WL 1753054, at *9 ("A lack of effort can undercut a claim of willingness."). Indeed, it would have been quite easy for Mother to assume even a small portion of responsibility for the condition of the Child while the Child was in Mother's custody; however, Mother testified that the Child's doctors and nurses simply did not listen to her and that her DCS case workers lied about Mother's care of the Child. "Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child[,]" and Mother has taken no such steps here. *Id.* (citing *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *18 (Tenn. Ct. App. May 8, 2018)).

On appeal, Mother asserts that she manifested a willingness to assume custody of the Child, noting Mother's testimony that Mother has "done everything [she] knew how to do . . . to attempt to regain custody." However, "[w]hen evaluating willingness, we look for more than mere words." *Id.* (citing *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018)). Consequently, we are unpersuaded by this argument. We are likewise unpersuaded that Mother's efforts at visitation with the Child demonstrate a willingness to assume custody, as the record shows these visits were by no means frequent and that Mother largely did not engage with the Child when visitation did occur. Again, a lack of effort undercuts Mother's argument here. *In re Jaxx M.*, 2019 WL 1753054, at *9.

As to the second prong, whether placing the Child in Mother's custody would "pose a risk of substantial harm to the physical or psychological welfare of the child[,]" the evidence supports the Trial Court's findings. Mrs. C. testified that although the Child's physical condition has improved, the Child still needs a very structured feeding schedule and close attention to her food intake. Given the issues addressed herein, we conclude that placing the Child in Mother's custody would "pose a risk of substantial harm to the physical . . . welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). Accordingly, this ground for termination was sufficiently proven.

### C. Mental Competence to Parent the Child

The Trial Court also determined that Petitioners proved by clear and convincing evidence that Mother's parental rights should be terminated based upon Tennessee Code Annotated section 36-1-113(g)(8). This ground for termination provides:

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child.

No willingness in the parent's failure need be shown to satisfy this ground. Tenn. Code Ann. § 36-1-113(g)(8)(C). "The General Assembly has determined that a parent's inability to adequately care for and supervise a child constitutes a just basis for termination of parental rights, even though such inability is not the result of willful conduct by the parent." *In re Samuel R.*, No. W2017-01359-COA-R3-PT, 2018 WL 2203226, at *8 (Tenn. Ct. App. May 14, 2018) (citing *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *7 (Tenn. Ct. App. Apr. 21, 2004)). "The statute serves to protect children from harm caused by a parent who is incapable of safely caring for them." *Id.* (citing *In re Lena G.*, No. E2016-00798-COA-R3-PT, 2017 WL 2304448, at *25 (Tenn. Ct. App. May 26, 2017)). The question is therefore "whether the child would be able to safely live with the parents." *Id.* (citing *State Dep't of Children's Servs. v. Oliver*, No. M2007-00844-COA-R3-PT, 2007 WL 4553036, at *8 (Tenn. Ct. App. Dec. 26, 2007)). For this ground, it is insufficient to show only that a parent suffers from mental incompetence; rather, "the real issue is whether this impairment adversely affects [the] ability to parent[.]" *In re C.C.*, No. E2016-00475-COA-R3-PT, 2016 WL 5266669, at *13 (Tenn. Ct. App. Sept. 22, 2016); *see also In re Quadayvon H.*, No. E2016-00445-COA-R3-PT, 2016 WL 7340427, at *8 (Tenn. Ct. App. Sept. 30, 2016) ("The issue in this case is not whether Father has impaired

15

cognitive functioning. Rather, the issue is whether his impairment adversely affects his ability to parent his children.").

We agree with the Trial Court that Petitioners satisfied their burden as to this ground. It is largely undisputed that Mother is not mentally competent. Mother stipulated that the Child was dependent and neglected in her custody because her intellectual disabilities render it difficult to provide the Child with appropriate medical care. Moreover, Mother testified at trial that her sister maintains a conservatorship over her and manages Mother's finances because Mother is unable to do so. Mother admitted at trial that she is often unable to understand what doctors and nurses tell her and that she requires another adult to attend doctor's appointments with her to take notes and explain the instructions to Mother later. In short, Mother's own admissions and testimony amount to clear and convincing evidence of Mother's mental incompetence.

Mother's argument on appeal in regards to the mental incompetence prong is unpersuasive. Mother asserts that this ground "requires clear and convincing evidence . . . best obtained by expert testimony or evidence of a prior diagnosis with ongoing treatment." Mother points us to no authority, nor have we found any, that expressly requires expert proof in order to satisfy this ground. In fact, this Court has previously held that expert proof is not required in every case and that trial courts may rely on the admissions and testimony of the parent in evaluating a parent's mental competency. *See In re Lorenda B.*, No. M2016-01841-COA-R3-PT, 2017 WL 1416858, at *10 (Tenn. Ct. App. Apr. 19, 2017) (declining to overturn the trial court's finding on the basis that no expert proof was offered, and noting that the "most glaring evidence" as to the mother's mental competence in that case was her erratic testimony at trial); *In re Shaneeque M.*, No. E2014-00795-COA-R3-PT, 2014 WL 6499972, at *9 (Tenn. Ct. App. Nov. 20, 2014) (finding that "expert testimony on the effect of a parent's mental illness on his or her ability to parent a child is not required," and noting that mother's testimony at trial was unresponsive, evasive, and untruthful). Like the *Lorenda B.* and *Shaneeque M.* courts, the Trial Court here considered Mother's own admissions[6] and testimony, as well as evidence that Mother's intellectual impairments inhibit her ability to provide adequate care for the Child.

---

[6] On appeal, Mother takes issue with the inclusion of the juvenile court records in the technical record; however, this is not designated as an issue on appeal. The juvenile court records were properly admitted as evidence at trial. *See* Tenn. R. App. P. 8A(c) ("[A]ny portion of a juvenile court file of a child dependency, delinquency or status case **that has not been properly admitted into evidence** at the termination of parental rights trial shall be excluded from the record.") (emphasis added). Moreover, there is nothing to suggest that the Trial Court improperly applied a preclusive effect to any of the issues at the termination hearing, as the Trial Court heard new proof and testimony as to all of the allegations in the petition in addition to the juvenile court records. To the extent Mother is now arguing that the Trial Court erred in considering the juvenile court records as evidence at all, this should have been designated as an issue for appeal. *See* Tenn. R. App. P. 13(b).

Mental incompetence of a parent, standing alone, is not a ground for termination of parental rights. Indeed, this Court has previously held that a parent with intellectual disabilities is capable of assuming the care and custody of a child under certain circumstances. *See In re C.C.*, 2016 WL 5266669, at *12 ("Even when a parent had been diagnosed with a mild intellectual disability, we have declined termination on this ground when the parent had successfully obtained vocational training, maintained employment, utilized public transportation, maintained a household, and secured a competent support system.") (citation omitted). Mother's parental rights have not been terminated *because* she has an intellectual disability. Rather, the appropriate inquiry, and the impetus of this entire case, is whether Mother's intellectual disabilities "adversely affect [her] ability to parent" this particular Child in light of the Child's special needs. *Id.* at *13. As discussed at length already, clear and convincing evidence reflects that Mother's ability to parent is adversely affected and that her issues are not likely to be remedied in the near future.

We affirm the Trial Court's determination that clear and convincing evidence supports termination of Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(8).

## II. Best Interests

In addition to proving a statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interests. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

Tennessee Code Annotated section 36-1-113(i) provides the factors for analyzing best interests:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

17

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This list is non-exhaustive. *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005)).

The Trial Court concluded that Petitioners proved by clear and convincing evidence that termination of Mother's parental rights is in the Child's best interests. Our review of the record has led us to the same conclusion. As discussed at length already, the evidence in the record demonstrates that Mother has not made an adjustment of her circumstances and especially her conduct so as to make her home safe for the Child. Tenn. Code Ann. § 36-1-113(i)(1). Mother's problems in caring for the Child persisted even after intervention

18

by DCS, and while Mother testified that she underwent the therapy and evaluations suggested by DCS, Mother's mindset at trial demonstrated that these services, if completed at all, did not have the desired effect. *Id.* § 36-1-113(i)(2). While the Court acknowledges that Mother attended some visitation with the Child, the record reflects that Mother was typically on her phone or otherwise not engaged with the Child. *Id.* § 36-1-113(i)(3). Pictures from visitation contained in the record show that frequently during visitation Mother was on her phone while the Child played by herself. Mother's behavior in this regard also speaks to factor four. *See id.* § 36-1-113(i)(4) ("Whether a meaningful relationship has otherwise been established between the parent or guardian and the child[.]").

Perhaps most importantly, the evidence in the record shows that the effect a change in caretakers is likely to have on the Child's emotional, psychological, and medical condition is substantial in this case. *Id.* § 36-1-113(i)(5). Mrs. C. testified that since being placed in Petitioners' home, the Child has gained weight and no longer requires a feeding tube. Mrs. C. testified that while the Child has vastly improved over the last few years, her caloric intake still has to be monitored and that the Child's feeding schedule requires close attention and structure. Despite the Child's global delays, she can write letters, identify colors, and spell her name. Overall, the record shows that while the Child will likely continue to need specialized care and attention, especially regarding her diet, the Child's particular needs are being met by Petitioners. This Court has substantial concern that the Child will regress if placed back in Mother's custody in light of Mother's testimony at trial. *Id.*; *see also id.* § 36-1-113(i)(8). Although we have acknowledged that it may not have been willful, the Child was essentially lingering in a state of medical neglect while in Mother's care, and there is no proof that Mother is now prepared to appropriately accommodate the Child's needs. *See id.* § 36-1-113(i)(6) & (i)(1).

As far as the remaining factors, there are no allegations of criminal activity ever taking place in Mother's home, and Mother paid some child support after the Child was removed by DCS. Consequently, these two factors militate in favor of Mother. *Id.* § 36-1-113(i)(7) & (9).

Here, the best interests factors weigh in favor of termination, and the factor addressing the Child's medical condition is of paramount importance. *See In re Marr*, 194 S.W.3d at 499 ("[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis."). Further, the Child is now integrated into a loving family that is equipped to deal with the Child's ongoing medical needs and wishes to adopt her if given the opportunity. Accordingly, we affirm the Trial Court's conclusion that Petitioners presented clear and convincing evidence that termination of Mother's parental rights is in the Child's best interests.

19

## CONCLUSION

The judgment of the Hamblen County Circuit Court is affirmed. Costs of this appeal are taxed to the Appellant Trista S., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE